# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| AHS STAFFING, LLC, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-CV-00402 |
| | § | Judge Mazzant |
| QUEST STAFFING GROUP, INC.; | § | |
| JACLYN WARD; MICHELLE SWANN; | § | |
| and SANDRA DOMINGUEZ, | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is AHS Staffing, LLC's ("AHS") Application for a Preliminary Injunction against Defendants Quest Staffing Group, Inc. ("Quest"), Jaclyn Ward ("Ward"), Michelle Swann ("Swann"), and Sandra Dominguez ("Dominguez") (collectively, "Defendants") (Dkt. #15). After reviewing the relevant pleadings and motion, the Court finds that the motion should be granted.

## BACKGROUND

AHS matches nurses and other healthcare professionals ("Candidates") on temporary and permanent bases with "hospitals, healthcare groups, occupational healthcare clinics, individual practitioners, networks, psychiatric facilities, government institutions and managed care entities and/or through contract management groups." (Dkt. #14 at p. 4). The healthcare staffing industry is highly competitive, so AHS must offer and deliver highly skilled healthcare providers at competitive rates to survive and thrive.

In order to ensure its competitive advantage, AHS claims to have compiled confidential and proprietary information, including:

(1)     [T]he identity of [AHS's] customers, clients, healthcare providers, contacts, prospects, and Candidates; (2) the business, finances and special needs of [AHS], its customers, clients, contacts, prospects, and Candidates; (3) [AHS's] policies and

procedures; (4) [AHS's] compensation plans and employee benefits; (5) confidential market studies; (6) pricing studies, information and analyses; (7) current and prospective business projections; (8) business plans and strategies; (9) non-public financial statements and information of [AHS], its clients and Candidates with whom [AHS] works; (10) methods of bidding, bids to customers, clients and prospects and profit margins; (11) unique software programs and databases developed by [AHS] including, but not limited to, all computer disks, slides, files, manuals, or other information pertaining to such software programs and databases; and (12) information regarding its employees' and Candidates' performance, compensation, skill sets and the confidential information known by the employees. (the "Confidential Information").

(Dkt. #14 at pp. 4–5). AHS purports to have developed and continually revised its Confidential Information through great labor and cost and that its Confidential Information is among its most valuable assets. AHS allegedly stores its most valuable Confidential Information—i.e. Candidates' contract statuses, professional skills, work history, availability, and compensation structures—in its Applicant Tracking System (the "Database").

AHS claims that its then-employees Ward, Swann, and Dominguez (collectively, the "Individual Defendants") maliciously changed the information for Candidates in the Database to whom the Individual Defendants were assigned as recruiters in order to hurt AHS's business. AHS further alleges that the Individual Defendants then left with a sizable amount of Confidential Information to work for its direct competitor, Quest. AHS next contends that Defendants have been using its trade secrets and confidential business information to compete with AHS in breach of their contractual and common law duties to AHS.

On July 9, 2018, AHS filed suit against Defendants, asserting claims for (1) violation of the computer fraud and abuse act against the Individual Defendants; (2) harmful access by computer against the Individual Defendants; (3) breach of contract against Ward; (4) breach of contract against Swann and Dominguez; (5) request for declaratory relief against the Individual Defendants; (6) misappropriation of trade secrets under the Texas Uniform Trade Secrets Act

("TUTSA") against Defendants; (7) tortious interference against Defendants; (8) breach of fiduciary duty against the Individual Defendants; and (9) civil conspiracy against Defendants (Dkt. #14). On July 9, 2018, AHS filed its application for a preliminary injunction, asking the Court to enjoin Defendants from using AHS's trade secrets (Dkt. #15). On July 23, 2018, Defendants filed their response (Dkt. #24). On July 25, 2018, AHS filed its reply (Dkt. #25). On July 26, 2018, Defendants filed their sur-reply (Dkt. #27). On the same day, the Court held a hearing on AHS's motions for preliminary injunction and expedited discovery (Dkt. #28).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

### I.    Likelihood of Success on the Merits

For the Court to grant a preliminary injunction, AHS must first demonstrate a substantial likelihood of success on the merits. This requires a movant to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v.*

*Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)).  A prima face case does not mean Plaintiffs must prove they are entitled to summary judgment.  *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

**A. AHS Is Likely to Succeed on the Merits for its Trade Secret Misappropriation Claim**

AHS alleges misappropriation of trade secrets against Defendants, seeking damages and "injunctive relief to enjoin [Defendants] from the continued misappropriation of its trade secrets." (Dkt. #14 at p. 23).  AHS argues that the Individual Defendants breached their employment and technology agreements with AHS by taking the Confidential Information in the Database.  AHS also asserts that the Individual Defendants were high-level employees and this status forged an independent duty to keep the Database secret and to use it properly.  Defendants counter that AHS did not fully apply its security measures associated with the Database to the Individual Defendants.  Defendants further aver there is no evidence that the Individual Defendants "improperly used any information that was not readily ascertainable or unprotected as a trade secret."  (Dkt. #24 at p. 10).

"Trade secret misappropriation under Texas law is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff."  *Wellogix, Inc. v. Accenture, L.L.P,* 716 F.3d 867, 874 (5th Cir. 2013) (quotations omitted); Tex. Civ. Prac. & Rem. Code § 134A.002.  "Under Section 134A.003 [of TUTSA] . . . a party may seek an injunction for actual or threatened misappropriation of trade secrets."  *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, No. A-14-CA00877-SS, 2015 WL 11438611, at *2 (W.D. Tex. Oct. 30, 2015) (citing Tex. Civ. Prac. & Rem. Code Ann. § 134A.003).  "'Proof of trade secret misappropriation often depends upon circumstantial evidence.'"  *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 326 (5th Cir. 2018) (alteration omitted) (quoting *Sw. Energy Prod.*

*Co. v. Berry-Helfand*, 411 S.W.3d 581, 598 (Tex. App—Tyler) *rev'd on other grounds*, 491 S.W.3d 699 (Tex. 2016)).

### i.   AHS Adequately Demonstrated that the Database Is a Trade Secret

AHS argues that the Database is a trade secret and permits it to "surgically target . . . top candidates, as opposed to cold-calling a long list of potential candidates over a long period of time." (Dkt. #16 at pp. 2–3).   AHS explains that "companies like AHS gain a competitive advantage through their knowledge of the market, including open positions and qualified and available candidates, and their ability to quickly match the two together."  (Dkt. #16 at p. 3).  As a result, AHS contends that its database "greatly increases AHS's chances of winning business." (Dkt. #16 at p. 3).  Defendants counter that the Database is not a trade secret because its supposedly proprietary information is readily available to the public.  Defendants further argue that the Individual Defendants did not execute AHS's "confidentiality, non-solicitation, and non-disclosure agreements.  Yet, their employment with AHS continued."  (Dkt. #24 at p. 8).

TUTSA defines a trade secret as

all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac & Rem. Code Ann. § 134A.002(6). Courts have recognized a compilation of compensation rates with otherwise publicly available information as a trade secret. *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *4 (W.D. Tex. Mar. 2, 2016) (explaining if those compensation rates were "obtained by a competing mortgage bank, [they] could be used to undercut Plaintiff's pricing."). Most importantly, even if a compilation of information consists of "readily available" information, "it may be protected as a trade secret given the difficulty and expense of compiling the information." *Id.* (citing *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983)). Additionally, "readily available information 'will be protected if the competitor obtained it working for the former employer.'" *Id.* (quoting *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 626 (S.D. Tex. 2011)).

As AHS's Chief Executive Officer Mark Smith ("Smith") declares in his affidavit, "[t]he quality of a Candidate is *not generally known* in the industry but *only obtainable* through extensive efforts to understand the market and the candidates." (Dkt. #16, Exhibit 1 at p. 3) (emphasis added). Smith further explains that if a competitor were "able to gain access to this information, [it] would immediately gain a significant advantage over AHS and other industry leaders." (Dkt. #16, Exhibit 1 at p. 3). AHS's Chief Technology Officer Brian Schwidder ("Schwidder") asserted in his affidavit that the development of the Database "required the investment of significant resources and was done over a considerable time as AHS continued to obtain additional information about its Candidates, customers and the market and continued to update the [Database] to reflect that information." (Dkt. #16, Exhibit 3 at p. 2). Schwidder elaborates that if AHS's competitors gained "access to [the Database, AHS's] competitive efforts would be severely hampered because [those competitors] would be able to more efficiently match and place

Candidates (both current and prospective) with customers (both current and prospective) using information not generally known in the industry." (Dkt. #16, Exhibit 3 at p. 2).

Smith declares that AHS protects the Database by (1) "making employees sign confidentiality, non-solicitation and non-disclosure agreements at the outset of their employment"; (2) keeping "all employees . . . subject to company policies that require them to maintain the confidentiality of all AHS information . . ."; and (3) having employees sign technology agreements that "limit the uses for which employees may use the information in [the Database] to acceptable uses in furtherance of those employees' job responsibility for AHS." (Dkt. #16, Exhibit 1 at p. 3). AHS asserted that Swann and Dominguez signed technology agreements, "promising to protect all [of AHS's] confidential information." (Dkt. #25 at p. 6; Dkt. #25, Exhibit 1 at pp. 6–7). Finally, AHS claimed to keep the Database "on a secure cloud server [where it] is password protected." (Dkt. #25 at p. 2). Though Defendants stress that "these safeguards were not implemented with respect to [the Individual Defendants]," courts do not require absolute protection of confidential information for it to qualify for trade secret protection. *360 Mortg.*, 2016 WL 900577, at *4 (finding that an employer protected a database's confidentiality by restricting its access with a "secure password," stressing its confidentiality in meetings, and labeling it as confidential). Accordingly, AHS demonstrated that it derives economic value from the Database, the Database's Confidential Information is not readily ascertainable, and it takes reasonable measures to keep the Database secret. Thus, the Court concludes that AHS has sufficiently shown a likelihood that the Database qualifies as a trade secret for purposes of this preliminary injunction analysis.

### ii.    AHS Made a Prima Facie Case that Defendants Acquired Its Trade Secret by Improper Means

AHS argues that the Individual Defendants misappropriated its trade secrets by taking Confidential Information from the Database and recruiting AHS's top talent after joining Quest.

AHS further avers that since the Individual Defendants went to a direct competitor of AHS, their disclosure of Confidential Information from the Database is inevitable. Aside from contending that the Database is not a trade secret, the Defendants claim that AHS offered no evidence that they "improperly used any information that was not readily ascertainable or [protected] as a trade secret." (Dkt. #24 at p. 10).

TUTSA partly defines "misappropriation" as

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i)     used improper means to acquire knowledge of the trade secret;

(ii)    at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

(a) derived from or through a person who used improper means to acquire the trade secret;

(b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret. . . .

Tex. Civ. Prac & Rem. Code Ann. § 134A.002(3)(A)(B). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(2) (emphasis added).

AHS presented a wealth of circumstantial evidence that strongly indicates Defendants acquired its trade secret by improper means. In the preliminary injunction hearing, AHS explained first that all three of the Individual Defendants misrepresented their reasons for leaving AHS as

well as their next professional endeavor.  Swann told AHS that she was leaving the company to look for a new job.  Ward assured AHS that she planned to take a sabbatical from business and suggested that she might eventually pursue physician recruitment with a different company—a field wholly separate from AHS's staffing business.  Finally, Dominguez claimed that she was leaving AHS to manage a hair salon.  None of the Individual Defendants mentioned Quest in their parting conversations with AHS.

When Ward departed AHS on May 11, 2018 she had already deleted her entire email "inbox," "sent box," and "deleted box" contrary to company policy.  At the time of the preliminary injunction hearing, AHS had still not been able to recover Ward's deleted emails.  Dominguez left AHS on May 12, 2018.  Swann left AHS on May 18, 2018.  Thereafter, all three of the Individual Defendants joined Quest.

Before the Individual Defendants left the company, AHS claims that they made extensive changes to the Database.  Schwidder declares that the Individual Defendants "had access to [the Database] and the information therein as part of their job responsibilities at AHS."  (Dkt. #16, Exhibit 3 at p. 3).  Schwidder explains that those with access to the Database were able to "delete or hide key information" and AHS keeps a "detailed log of any changes made to important records, including who made the change, when the change was made and the type of change."  (Dkt. #16, Exhibit 3 at p. 3).

Schwidder asserts that before the Individual Defendants departed AHS there were "widespread and unusual alterations of Candidate records in critical fields [of the Database] including Assigned Recruiter, Status and Contact Information."  (Dkt. #16, Exhibit 3 at p. 3).  Schwidder claims that "[t]he alterations [he] discovered were well beyond the scope of any alterations that would have been made in the normal course of business."  (Dkt. #16, Exhibit 3 at

p. 3). All told, Schwidder declares that 531 candidates "had their Assigned Recruiter deleted," 237 Candidates "had their Status changed," and seventeen (17) Candidates "had their Contact Information altered." (the "Modified Candidates") (Dkt. #16, Exhibit 3 at p. 4). Given the highly irregular "nature, scope, and timing of these changes," Schwidder asserts that he believes "it is reasonable to assume that these changes were made as part of a deliberate effort to modify the [Database] to the detriment of AHS prior to the departure of the Individual Defendants." (Dkt. #16, Exhibit 3 at p. 5).

Specifically, Schwidder states that "Swann was responsible for changing at least [193] Candidate profiles before she unexpectedly terminated her employment with AHS. Over 60 [percent] of these Candidates were changed into 'non-placeable' or 'unavailable' Status." (Dkt. #16, Exhibit 3 at p. 4). Schwidder further declares that "Ward was responsible for changing at least [189] Candidate profiles before leaving AHS. Over sixty [(60)] of these Candidates were changed into 'non-placeable' or 'unavailable' Status." (Dkt. #16, Exhibit 3 at p. 4). Finally, Schwidder states that "Dominguez was responsible for changing at least ninety-three [(93)] Candidate profiles, the majority of which had their Assigned Recruiter deleted. Of these ninety-three [(93)] Candidates, twenty-four [(24)] had their Status changed—most were changed into a 'nonplaceable' or 'unavailable' status." (Dkt. #16, Exhibit 3 at p. 4).

As AHS explained at the preliminary injunction hearing, these alterations turned "hot" leads for Candidates into "cold" leads and removed them from AHS's consideration for immediate staffing assignments. AHS further explained that the alterations of the Candidates' contact information were aimed to stop AHS from being able to contact the Candidates and, as a result, to prevent AHS from assigning them to staffing opportunities.

AHS claimed that "[a]fter convincing the Individual Defendants to resign from AHS to work with them, Quest and the Individual Defendants began to solicit AHS customers via phone and email." (Dkt. #16 at p. 6). Smith declares "[s]ince [the Individual Defendants] terminated their employment with AHS and accepted employment at competitor Quest, [AHS has] lost at least thirty [(30)] of [its] most sought-after Candidates in the form of lapsed and non-renewed contracts." (Dkt. #16, Exhibit 1 at p. 6). Smith explains that "[t]his is highly unusual and in [his] opinion, directly related to [the Individual Defendant's] alteration of these Candidates' profiles." (Dkt. #16, Exhibit 1 at p. 6).

In their affidavits, the Individual Defendants do not address Schwidder's implication that they maliciously altered critical information in the Database before leaving or Smith's insinuation that they caused the irregular loss of many of AHS's most sought after Candidates after their departure (Dkt. #24, Exhibit 1–3). Instead, Swann and Dominguez only claim that they "remove[d] their names as the recruiter assigned to a prospect or candidate." (Dkt. #24, Exhibit 2 at p. 2, Exhibit 3 at p. 3). Only Ward denies changing the status of Candidates (Dkt. #24, Exhibit 1 at p. 4). Moreover, the Individual Defendants do not wholly deny taking confidential information from the Database. At most, Ward claims that she "never downloaded information from the [Database] or transferred [Database] information to [her] new employer, Quest." (Dkt. #24, Exhibit 1 at p. 4). Ward also claims that she deleted her emails "based on [her] understanding that these steps were required in order to reissue [her] AHS laptop to another employee." (Dkt. #24, Exhibit 1 at p. 2).

Ward avers that "[b]efore leaving AHS [she] accessed the [Database] maintained by AHS . . . to remove my name as the recruiter assigned to a prospect so that another recruiter at AHS could be assigned to the prospect." (Dkt. #24, Exhibit 1 at p. 4). Dominguez makes a similar

claim, adding that "[she] informed John Clements of the change [she] made on the system without objection from him, and [she] provided Mr. Clements with a full list of the prospects and candidates [she] had been recently working with at AHS." (Dkt. #24, Exhibit 2 at p. 2). Finally, Swann asserts that she also "removed [her] name as the recruiter assigned to a prospect or candidate so that the prospect or candidate could be reassigned by AHS to a new AHS recruiter." (Dkt. #24, Exhibit 3 at p. 3). Swann stated that it "was [her] understanding this was AHS standard practice." (Dkt. #24, Exhibit 3 at p. 3).

John Clements ("Clements")—President of the NurseStat Division of AHS—counters these denials of misconduct by declaring that he never ordered any of the Individual Defendants to make any changes to the Database before leaving AHS and did not know about their modifications to the Database when she departed (Dkt. #25, Exhibit 1 at p. 4). At the preliminary injunction hearing, AHS further explained that there was no way that it would have instructed the Individual Defendants to modify the Database since it did not even know about the changes until after the Individual Defendants had left AHS. Accordingly, AHS adequately demonstrated that the Individual Defendants acquired its trade secret by improper means and Quest acquired AHS's trade secret when it knew or had reason to have known that it was acquired by improper means or used[1] AHS's trade secret after it was "derived from or through a person who used improper means to acquire the trade secret." *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3). Thus, the Court finds that AHS made a prima facie case that Defendants obtained its trade secret by improper means for purposes of this preliminary injunction analysis.

---

[1] The Court discusses Quest's use of the Database in the following section. *Infra* at 13–15 "AHS Made a Prima Facie Case that Defendants Used Its Trade Secret Under TUTSA."

### iii.    AHS Made a Prima Facie Case that Defendants Used Its Trade Secret Under TUTSA

"As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'"  *GE Betz*, 885 F.3d at 326 (quoting *Wellogix, Inc.*, 716 F.3d at 877).

AHS presented ample circumstantial evidence to indicate Defendants used its trade secret in a manner likely to injure AHS and enrich Defendants.  Clements declares that Swann contacted one of AHS's "most promising Candidates *on behalf of Quest*," making "specific reference to the Candidate's current placement, end date and location."  (Dkt. #25, Exhibit 1 at p. 5) (emphasis added).  Clements claims that "[t]his information is not publicly available, and could have only been learned by . . . Swann in the course of her employment with AHS and through her access to the [Database] because this Candidate had worked exclusively with AHS in the past."  (Dkt. #25, Exhibit 1 at p. 5).

At the preliminary injunction hearing, AHS presented documentary evidence of a phone call between one of AHS's Candidates ("Candidate A") and Swann on July 3, 2018.  In that conversation, Swann told Candidate A that "[s]he knew that [Candidate A's] contract was up in Greenville, North Carolina June 9 and repeated this several times and wanted to talk to [Candidate A] about a new travel assignment."  (Dkt. #25, Exhibit 2 at p. 2).  Candidate A explained in the documentary evidence that she asked Swann "how she even knew about [Candidate A's] contract and told her again [that Candidate A had] never spoken to her ever and [Swann] insisted [they] had and wanted to follow up from [their] previous conversation."  (Dkt. #25, Exhibit 2 at p. 2).  AHS stressed that Candidate A's contract end date on June 9 was "absolutely not publicly available" and the timing of Candidate A's contract termination—a few weeks before Swann

contacted her on July 3—made her a "hot" lead. AHS also offered an email solicitation that Swann sent to Candidate A as evidence of use of its trade secret (Dkt. #16, Exhibit 5 at p. 2).

AHS next offered an email string beginning with Ward's solicitation of one of AHS's Candidates and ending with the Candidate's AHS recruiter explaining that the Candidate "called [her] last night to ask if [AHS] sold her info because she's not signed up with anyone but [AHS, yet] she is getting calls and emails all of a sudden." (Dkt. #16, Exhibit 2 at p. 2). Again, the Candidate's contract had "just ended in April" and Ward contacted her on May 22, 2018 (Dkt. #16, Exhibit 2 at p. 2). Accordingly, AHS presented two cases where the Individual Defendants—specifically, Ward and Swann—solicited AHS's Candidates using non-public information shortly after the end of their contract dates. As AHS explained, such Candidates were "hot leads" since their contracts had just expired and they were likely looking for new assignments.

Next, Schwidder declares that he "learned of another call made by Dominguez to one of [AHS's] Candidates [where she] similarly solicits the . . . Candidate [and] references the amount that Quest can pay as compared to 'competitors.'" (Dkt. #16, Exhibit 3 at p. 5). Schwidder contends that this "indicates knowledge of AHS's compensation structure that Dominguez necessarily would have learned through her employment with AHS and [her] access to [the Database]." (Dkt. #16, Exhibit 3 at pp. 5–6).

Additionally, Dominguez's alleged alteration of the Database—i.e. changing at least ninety-three (93) Candidate profiles, deleting the assigned recruiter for the majority of these Candidate profiles, and changing the status for twenty-four (24) of the Candidate profiles to "non-placeable" or "unavailable"—was a "use" of the Database as it was "exploitation . . . likely to result in injury to the trade secret owner." (Dkt. #16, Exhibit 3 at p. 4); *GE Betz*, 885 F.3d at 326 (quoting *Wellogix, Inc.*, 716 F.3d at 877). After all, by allegedly making these alterations,

Dominguez turned hot leads into cold leads, prevented AHS from pursuing the most available Candidates, and injured AHS's business of staffing Candidates with healthcare providers. Indeed, AHS demonstrated that the Individual Defendants all used the Database on this basis since all of the Individual Defendants allegedly modified the Database to turn hot leads into cold leads by changing Candidate statuses to "non-placeable" and "unavailable." (Dkt. #16, Exhibit 6 at p. 4).

All of this evidence strongly indicates that the Individual Defendants and, indeed, Quest as their employer used the Database to their benefit and to AHS's detriment. In its briefing and in the preliminary injunction hearing, AHS clearly and comprehensively connected the dots between this copious circumstantial evidence and its cause of action for misappropriation of Trade Secrets under TUTSA. Thus, the Court finds that AHS presented a prima facie case for misappropriation of trade secrets under TUTSA and is likely to succeed on the merits of this facet of its misappropriation of trade secrets claim.

### iv. AHS Made a Prima Facie Case for Injunctive Relief due to Threatened Misappropriation Under TUTSA

"[T]o establish threatened disclosure, the law requires [Plaintiff] to show disclosure of specific trade secrets would benefit [an employee's new employer]." *St. Jude Medical*, 2015 WL 11438611, at *3 (citing *Conley v. DSC Commc'ns Corp.*, No. 05-98-01051-CV, 1999 WL 89955, at *3 (Tex. App.—Dallas Feb. 24,1999, no pet.)) (applying the trade secret disclosure test from *Conley*). This arises from the fact that

> [c]ertain duties, *apart from any written contract*, arise upon the formation of an employment relationship. One of those duties forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. This obligation survives termination of employment. Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment.

*Conley*, 1999 WL 89955, at *3 (citations omitted) (emphasis added). Courts recognize "that enjoining an employee from using an employer's confidential information is appropriate when it is *probable* that the former employee will use the confidential information for his benefit (or his new employer's benefit) or to the detriment of his former employer." *Id.* at *4 (citation omitted). When assessing a trade secret's potential benefit to a new employer and its detriment to an old employer, courts consider the similarities of the market in which the two employers operate. *St. Jude Med.*, 2015 WL 11438611, at *3 (explaining that the plaintiff could not show threatened disclosure because "the marketing strategies in Europe and the United States [where the current and former employers do business] are 'extremely different.'").

The parties do not dispute that AHS and Quest provide the same service—matching medical Candidates with healthcare providers—and are direct competitors. In turn, the confidential information in AHS's database would certainly benefit Quest and would certainly harm AHS. Thus, the Individual Defendants' disclosure of the Confidential Information in the Database to Quest is probable as doing so would benefit Quest and harm AHS. In turn, AHS has made a prima facie case for injunctive relief for threatened misappropriation of its trade secret under TUTSA. *St. Jude Med.*, 2015 WL 114338611, at *3.

**B. AHS Is Likely to Succeed on the Merits for its Breach of Contract Claim Against Ward**

AHS argues that Ward signed an Employment Agreement with AHS, promising "not to solicit candidates or customers of AHS on behalf of a competitor." (Dkt. #16 at p. 7). AHS claims that Ward also "promised not to use or disclose any confidential information or trade secrets she learned from AHS." (Dkt. #16 at. p. 7). Defendants argue that since the Database is not a trade secret, AHS's "breach of contract claim based on misappropriation of trade secrets has no likelihood of success." (Dkt. #24 at p. 13 n.40). Defendants further aver that Ward never worked

with the Candidate whom she contacted while working at AHS, and AHS offered no evidence to prove otherwise. Defendants thus contend that Ward's contacting the candidate "does not violate the Employment Agreement." (Dkt. #27 at p. 4).

The Employment Agreement stipulates that it "shall be governed by the internal law, exclusive of law conflicts, of the State of Oklahoma." (Dkt. #25, Exhibit 5 at p. 10). With regard to the Employment Agreement's Governing Law Provisions

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of Restatement (Second) of Conflict of Laws], would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex. 1990) (citations omitted). Here, the parties can resolve their dispute over whether Ward breached her Employment Agreement by disclosing, among other things, AHS's trade secrets using the explicit language of the Employment Agreement. After all, the Employment Agreement expressly defines trade secrets, proprietary documents, confidential information, and the duty not to disclose such documents (Dkt. #25, Exhibit 5 at pp. 5–6). Thus, the Court will apply Oklahoma Law.

Under Oklahoma Law, a valid contract requires "(1) parties capable of contracting, (2) their consent, (3) a lawful object, and (4) sufficient cause or consideration." 15 O.S. § 2. "A breach of contract is a material failure of performance of a duty arising under or imposed by agreement." *Lewis v. Farmers Ins. Co.*, 1983 OK 100, 681 P.2d 67, 69. Under Oklahoma law, a plaintiff can support a breach of contract claim with direct and circumstantial evidence. *Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.*, 1997 OK 7, 933 P.2d 282, 290. Defendants only contest whether Ward actually breached the Employment Agreement, so the Court will only decide this element.

The most relevant portions of AHS's Employment Agreement state:

### Section 8 – Property Rights

The following items of property are legitimate protectable business interests of the Company:

**8.1 Trade Secrets.** The Company agrees that the Employee will be given access to and allowed to become familiar with various trade secrets of the Company to the extent applicable to the Employee's position. These trade secrets may include, but are not limited to compilations of information, records and specifications, customer lists, and special patterns or formulas which are regularly used in the operation of the Business of the Company ("*Trade Secrets*") as of the Effective Date. The Employee agrees that the Employee shall not disclose, convert, or use any of the Trade Secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or thereafter; except as required in the ordinary course of the Employee's employment for the benefit of the Company.

**8.2 Proprietary Documents.** The Company agrees that the Employee will be provided access to some Proprietary Documents of the Company to the extent applicable to the Employee's position. For purposes of this Agreement "*Proprietary Documents*" include all documents acquired at the expense of the Company or through the labor of its employees including forms, information summaries, manuals or records, memoranda, notes, drawings, documents, or other writings whatsoever made, compiled, acquired, including but not limited to, documents containing the identities of the Company's customers, contractors, suppliers, or others with whom the Company has a business relationship, and the Company's arrangements with such parties as of the Effective Date. The Employee agrees that the Employee shall not disclose, convert, or use any of the Proprietary Documents, directly or indirectly, nor use them in any way, either during the term of this Agreement or thereafter, except as required in the ordinary course of the Employee's employment for the benefit of the Company.

**8.3 Confidential Information.** The Company agrees that in connection with the Employee's position with the Company, the Company will provide the Employee with access to Confidential Information about the Company and the Company's customers to the extent applicable to the Employee's position. Accordingly, the Employee understands and agrees that the Employee shall acquire no right, title, or interest in or to any Confidential Information and that all Confidential Information remains the sole and exclusive property of the Company. The Employee agrees not to reveal the Confidential Information to anyone other than authorized personnel of the Company or customers authorized by the Company. Confidential Information may also be protected as a Trade Secret under Subsection 8.1, hereinabove. For purposes of this Agreement, the term "*Confidential Information*" shall include any Trade Secrets; Proprietary Documents; information about the Company or pertaining to the Business of the Company, or the Company's sales, financial condition, products, customers, suppliers, distributors, or inventory, technical personnel, including, but not limited to, records, lists, and knowledge of the Company's clients, customers, suppliers, distributors, licensors and licensees, technical personnel, services, methods of operation, processes, methods of determination of prices, profits, sales, net income, indebtedness, marketing data, sales techniques, advertising, traveling and canvassing methods, business ideas and opportunities, and drawings, plans, and designs as of the Effective Date, but shall not include information in the public domain at the time it was acquired or which comes into the public domain.

**8.4 Handling of Covered Items.** All Confidential Information covered by Subsections 8.1 through 8.3, hereinabove, shall remain the exclusive property of the Company and shall not be removed from the premises of the Company under any circumstances whatsoever without the consent of the Company. If removed from the Company premises with consent, such information and material will be used only for the benefit of the Company in the ordinary course of business. All Confidential Information covered by Subsections 8.1 through 8.3, hereinabove, is, and shall continue to be, the property of the Company, and shall, together with all copies thereof, be returned and delivered to the Company by the Employee immediately without demand, upon the termination of the Employee's employment with the Company, and shall be returned at any time if the Company so demands.

**8.5 Duty Not to Disclose.** During and after the Term of this Agreement, the Employee agrees that the Employee will hold in confidence and not directly or indirectly reveal, report, publish, disclose, or transfer any Trade Secrets, Proprietary Documents, or Confidential Information (including the terms of this Agreement), to any person or entity, or utilize any such information for any purpose, except in the course of the Employee's performance of her obligations under this Agreement. The Employee further agrees that the Employee will not copy or disclose any Trade Secrets, Proprietary Documents, or Confidential Information (including the terms of this Agreement) without the prior written consent of the Company.

(Dkt. #25, Exhibit 5 at pp. 5–6).

### AHS Presented a Prima Facie Case that Ward Disclosed Its Trade Secrets, Confidential Information, and Proprietary Documents in Breach of the Employment Agreement

AHS's breach of contract claim against Ward, among other things, restates its trade secret misappropriation claim. Put simply, AHS claims that Ward had a contractual as well as a statutory obligation not to disclose its trade secret—i.e. the Database. AHS provided a multitude of evidence that Ward improperly obtained and used AHS's trade secret—i.e. the Database's confidential information—in breach of the duly executed Employment Agreement. *Supra* at 5–13. AHS offered a mountain of direct and circumstantial evidence to suggest that Ward (1) tampered with the Database to harm AHS's business, (2) sent emails, impliedly containing Confidential Information from the Database, and then erased those emails to cover her tracks, and (3) disclosed Confidential Information from the Database to Quest. In turn, AHS made a prima facie case that Ward breached the section of her Employment Agreement, mandating that she

> shall not *disclose, convert, or use* any of the Trade Secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or thereafter; except as required in the ordinary course of [her] employment for the benefit of [AHS].

(Dkt. #25, Exhibit 5 at p. 5) (emphasis added). Though the Court quotes the language associated with the Trade Secret provision of the Employment Agreement, Ward's actions also apparently run afoul of the Proprietary Documents, Confidential Information, Handling of Covered Items, and Duty Not to Disclose Provisions of the Employment Agreement (Dkt. #25, Exhibit 5 at pp. 4–6). After all, AHS demonstrated that the Database contained confidential information—most critically its top Candidate's contract information. Next, AHS presented sufficient evidence that its Trade Secrets and Confidential Information were "acquired at the expense of the Company or

through the labor of its employees," making them Proprietary Documents under the Employment Agreement (Dkt. #25, Exhibit 5 at p. 5). Put simply, the provisions of the Employment Agreement with regard to AHS's Confidential Information overlap and AHS has made a prima facie case that Ward violated at least one and possibly all of them through her alleged malfeasance. Thus, the Court finds that AHS is likely to succeed on the merits of this portion of its breach of contract claim against Ward. Since AHS demonstrated that it is likely to succeed in these facets of its breach of contract claim against Ward, the Court will not consider whether Ward violated the Employment Agreement's non-solicitation provision. Since the Court finds that AHS is likely to succeed on the merits of its trade secret misappropriation claim and breach of contract claim against Ward, the Court will decide whether AHS satisfied the remaining criteria to obtain a preliminary injunction.

## II. Likelihood of Irreparable Harm

AHS must demonstrate they it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22. AHS faces irreparable harm by Defendants' misappropriation of trade secrets because Defendants can benefit from AHS's trade secrets without first investing the time, expense, and labor necessary to research and compile the confidential information in the Database. *See Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 260 (Tex. App.—Dallas Aug. 21, 2014, no pet.) (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 158 Tex. 584, 314 S.W.2d 782 (1958)). Defendants' possession of confidential information from the Database allows them to enhance Quest's proprietary database through AHS's labor. This cannot

be undone by money alone.  Any calculation of monetary damages would fail to fully appreciate the harm done by Defendants' developing a more robust database by skipping the necessary research and development undertaken by every other competitor.  *Halliburton*, 444 S.W.3d at 260.

## III.    Balance of Hardships

When deciding whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  Courts consider several factors in balancing the equities.  Notably, courts consider the threat of disclosure of the trade secrets by defendants, *Cisco Sys., Inc. v. Huwaei Techs.*, 266 F. Supp. 2d 551, 555–58 (E.D. Tex. 2003), whether the injunction will effectively destroy a party's business, *Anadarko Petroleum Corp. v. Davis*, No. H-06-2849, 2006 WL 3837518, at *24 (S.D. Tex. Dec. 28, 2006), and whether denial will cause a loss of current market share or simply reduce prospects for expansion, *Flywheel Fitness, LLC v. Flywheel Sports, Inc.*, No. 4:13-CV-48, 2013 WL 12138593, at *4 (E.D. Tex. 2013).

Here, the equities favor a preliminary injunction limited to the Modified Candidates—i.e. the 531 Candidates in the Database who had their assigned recruiter deleted, the 237 Candidates in the Database who had their status changed, and the seventeen (17) Candidates in the Database who had their contact information altered (Dkt. #16, Exhibit 3 at p. 4).  As previously discussed, the Court finds that disclosure of AHS's Confidential Information from the Database by its former employees to Quest—AHS's Direct Competitor—is probable.  Ward claimed that Quest has a larger database than AHS so a preliminary injunction will not destroy Quest (Dkt. #24, Exhibit 1 at p. 3).  For the same reasons, precluding Defendants from contacting the Modified Candidates

may reduce Quest's prospects for expansion but will not cost it any market share. Thus, the equities favor granting a preliminary injunction.

## IV.    The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312). This factor overlaps substantially with the balance-of-hardships requirement. *Id.* "The purpose of an injunction is to remove the advantage created by the misappropriation." *Halliburton*, 444 S.W.3d at 257 (citing *Bryan v. Kershaw*, 366 F.2d 497, 502 (5th Cir. 1966). Indeed, "the undoubted tendency of the law has been to recognize and enforce higher standards of commercial morality in the business world." *Id.* (quoting *Hyde Corp. v. Huffines*, 158 Tex. 566, 581–82, 314 S.W.2d 763, 773 (1958)). Here, a preliminary injunction serves the public interest by depriving Defendants of the benefit of the allegedly misappropriated trade secret and, in so doing, enforces better business ethics by depriving the alleged wrongdoers of the benefit of their wrongdoing. Thus, the Court finds that a preliminary injunction will only serve the public interest.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Application for Preliminary Injunction (Dkt. #15) is hereby **GRANTED**.

It is further **ORDERED** that Defendants Quest Staffing Group, Inc., Jaclyn Ward, Michelle Swann, and Sandra Dominguez, their officers, agents, servants, consultants, contractors, employees, attorneys, and any person or entity in concert or participation with them, are hereby **ENJOINED** from contacting the Modified Candidates in AHS Staffing, LLC's Applicant Tracking System—i.e. the 531 Candidates in the Database who had their assigned recruiter

deleted, the 237 Candidates in the Database who had their status changed, and the seventeen (17) Candidates in the Database who had their contact information altered (Dkt. #16, Exhibit 3 at p. 4).

It is further **ORDERED** that this Preliminary Injunction shall not be effective unless and until AHS Staffing, LLC files an appropriate bond or cash deposit in lieu thereof in the amount of $1,500.

**SIGNED this 15th day of August, 2018.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE